UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

MARISOL MORALES,

                Plaintiff,

  v.                                      3:15-cv-00301 (CSH)

BARBERINO BROTHERS, INC.,

                Defendant.

**RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

HAIGHT, Senior District Judge:

In this action, Plaintiff Marisol Morales brings suit against Defendant Barberino Brothers, Inc. ("Barberino"), an automobile dealership in Wallingford, CT, in relation to Defendant's allegedly improper and deceptive practices in connection with its sale of a car to Plaintiff.  Plaintiff brings claims under the federal Truth in Lending Act, 15 U.S.C. § 1601, *et seq.* ("TILA") and the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a *et seq.* ("CUTPA").  Defendant has moved for summary judgment as to both counts under Rule 56 of the Federal Rules of Civil Procedure, seeking dismissal of Plaintiff's case in full.  This Ruling resolves the motion.

**I.    Background**

The following facts are derived from the parties' submissions pursuant to Local Rule 56(a), uncontroverted deposition testimony, and the exhibits attached to the parties' respective memoranda of law.  Docs. 34-37.  The facts recounted in this section are undisputed or indisputable.

On December 19, 2014, Plaintiff visited Barberino with her boyfriend in search of a new vehicle, her first ever visit to a car dealership.  56(a) ¶ 2; Doc. 35-1, at 27.  On a return visit the following day, she completed the purchase of a new 2015 Nissan Altima, effectuated through a

Retail Purchase Order and financed via a Retail Installment Contract. 56(a) ¶¶ 2-3; Doc. 34-2. Prior to executing the agreements, Plaintiff spent only 15-20 minutes in Barberino's Finance Manager's office, asked no questions about the paperwork, did not read the Retail Installment Contract,[1] and did not negotiate. 56(a) ¶¶ 5-7; Doc. 34-4, at 35-36. She testified Defendant "told me there was not too much time. I felt like I was being rushed to sign the paperwork. . . . [H]e kept giving it to me, and he said you got to sign here, you got to sign here." Doc. 35-1, at 60.

The cash price Barberino charged Plaintiff for the vehicle was $31,322.80.[2] Doc. 34-2. However, the manufacturer's suggested price was $24,150.00, as listed on the "Monroney sticker" attached to the car at the Barberino dealership.[3] Doc. 36-3. Barberino subtracted $3,500 from the car's cash price of $31,322.80 to reflect a trade-in discount for Plaintiff's 2001 Toyota Camry, which had accumulated 200,930 miles and whose actual value approached $0. *Id.*; Doc. 36-4 Ex. 1, at 40. Plaintiff received the $3,500 trade-in discount in connection with a promotion that Barberino had been advertising at the time, which provided a $3,500 discount for trade-in vehicles regardless of actual value. Doc. 36-4 Ex. 1. The conditions of that program were as follows:

> 1) not negotiable for cash; 2) must be used towards a new or used car; 3) in lieu of negotiation on price of a new or used car; 4) all rebates and incentives to the dealer with customer responsible for applicable

---

[1] The record is silent as to whether Plaintiff read the Retail Purchase Order.

[2] This price included a $199 optional "VIN Etch" fee but not a $1,798,43 sales tax.

[3] The "Monroney sticker" is so-called in light of a bill sponsored by former New York Senator Mike Monroney, which became 15 U.S.C. § 1231-33, known as the Automobile Information Disclosure Act of 1958. The Act requires all manufacturers of new automobiles to "securely affix to the windshield, or side window of [a new] automobile a label on which such manufacturer shall endorse clearly, distinctly and legibly true and correct entries disclosing [certain specific] information concerning such automobile," including "the retail price of such automobile suggested by the manufacturer."

tax; and 5) cannot be combined with other offers.

Def.'s Resps. to Plf.'s Interrogatories [Doc. 36-4 Ex. 2] ¶ 5.

Despite its program crediting customers $3,500 for all trade-in vehicles, Barberino readily acknowledges its policy, which it applied as to Plaintiff's purchase, to include in its initial cash price offer for the car the amount it credits to the customer for the trade-in.[4]  Doc. 36-4 Ex. 1, at 32-33. This came to light during the deposition of Hugo Loureiro, Barberino's General Sales Manager, who testified in detail as to Barberino's price offering process.  The process is driven in the first instance by the financing agent with which Barberino works.  That entity first provides Barberino what is called a "front-end advance number," which, at least in this case, amounted to 115% of the manufacturer's invoice, otherwise known as the "book-out invoice number."  Here, the book-out invoice number was $22,672, leading to a front-end advance of $26,672.80.  However,

> [t]his [$26,672.80] is not what they agree to finance.  This [$26,672.80] that they have here is what they agree that you can use as your front-end number, *plus cash, rebates, trade.*  That can be your sale price line, which you notice, our sales price is not [$26,672.80] it's 31,123.80, that would be because, like I said, we can take their [$26,672.80] front-end advance and *add any cash, which we have zero, rebate, which we have 1,750, and trade value, which we have 3,500*, which gives us 31,123.80. . . .  So, we're talking strictly front-end advance with this figure at the top here, *but you can add, like I said, any cash, rebates or trade to that number*.

Doc. 36-4 Ex. 1, at 31-33 (emphases added).  Louriero then clarified that this allowed Barberino to add the $3,500 trade-in value of Plaintiff's car back into the cash price that Barberino offered

---

[4]  Of note, as acknowledged in Defendant's responses to Plaintiff's interrogatories, customers are not allowed to negotiate the price of the new car if they want to take advantage of the $3,500 trade-in program.  Doc. 36-4.

Plaintiff for the new car.[5]  Louriero acknowledged that it was Barberino's standard procedure to make its initial offer to a customer match the maximum price for a vehicle that was approved by the lender, *including* the upward additions discussed above, and that it is "then up to the customer to negotiate down from that point."  Doc. 36-4 Ex. 1, at 15.  Worthy of reiteration, however, is that Barberino's trade-in program did not allow the customer to negotiate.  Def.'s Resps. to Plf.'s Interrogatories [Doc. 36-4 Ex. 2] ¶ 5.  And, Louriero testified that Plaintiff did not in fact negotiate, and that she accepted the maximum offer with which she was presented.  Doc. 36-4 Ex. 1, at 36.  In short, then, Barberino's trade-in program policy, which it applied to Plaintiff, was to deduct a $3,500 purported trade-in value only from a non-negotiable cash price offer that included a $3,500 upcharge.  In other words, Barberino effectively credits customers like Plaintiff $0 for their trade-ins despite advertising that it would offer them a $3,500 credit.  This practice is at the core of Plaintiff's complaint.

To effectuate the purchase of the car, Plaintiff entered into a financing agreement pursuant to the Retail Installment Contract with Barberino, which assigned its interest to non-party Regional Acceptance Corporation ("Regional").  Doc. 34-2.  Including costs and fees, Plaintiff agreed to have $29,280.23 financed through the credit agreement, which carried a $15,517.45 finance charge, reflecting a 14.95% Annual Percentage Rate.  Plaintiff was thereby indebted $44,797.68, to be paid in 72 monthly installments of $622.19, with first payment due February 3, 2015.

Shortly after purchasing the car, Plaintiff came to believe that Barberino engaged in a multitude of improper and illegal practices in securing her purchase and financing of the car.  She brought the instant suit on March 2, 2015, which, pursuant to the Amended Complaint, brings claims

---

[5]  When asked, "Start[ing] with this 26,072.80, tell me – so Ms. Morales' case, it was $3,500 for a trade-in, so we would add that?," Louriero testified, "To the 26,072.80, yes."  Doc. 34-4, at 34.

for violation of TILA and of CUTPA.  She alleges Defendant violated TILA in two ways: (i) failing

to accurately itemize the amount financed; and (ii) failing to accurately disclose the finance charge.

Doc. 31 ¶¶ 65, 68.[6]  As to CUTPA, Plaintiff brought suit in light of a number of allegedly deceptive

and unfair acts, which she specifically lists in her summary judgment opposition.  Doc. 36, at 6-7.

Plaintiff also claims that Defendant violated certain Connecticut Department of Consumer Protection

regulations which, she asserts, constitute *per se* CUTPA violations.  Principally, Plaintiff claims that

Defendant violated Conn. Agency. Reg. § 41-110b-28(b)(7), which states as follows:

> It shall be an unfair and deceptive act or practice for a new car dealer
> or used car dealer to advertise in any manner the price which will be
> paid by such dealer for trade-in vehicles unless the price of the
> vehicle sold by such dealer to the owner of the trade-in vehicle is
> within the range of prices at which the dealer usually sells such
> vehicles and is not increased because of the amount paid for the trade-
> in vehicle.[7]

Defendant has moved for summary judgment as to both claims.

---

[6]  In her opposition to summary judgment, Plaintiff seems to withdraw her claim that
Defendant violated TILA by failing to accurately disclose the finance charge. *See* Doc. 36, at 13.

[7]  Defendant egregiously mischaracterizes the language of this regulation.  It argues that a
violation is only established if **both** the vehicle sold is "within the range of prices at which the
dealer usually sells such vehicles **and** is not increased because of the amount paid for the trade-in
vehicle." Doc. 34-1, at 6-7.  This is an impossible reading of the regulation.  The regulation's
first clause states a general rule: CUTPA is violated where a dealer "advertise[s] in any manner
the price which will be paid by such dealer for trade-in vehicles."  It then documents a singular
exception to that rule, identified by the term "unless."  A party fits into that exception only where
*both* of the conditions that follow are met, made clear by the conjunction "and" within the clause
containing the exception.  As such, § 41-110b-28(b)(7) is violated where a dealer "advertise[s] in
any manner the price which will be paid by such dealer for trade-in vehicles," and that dealer
*either* (i) sells the customer a vehicle that is not "within the range of prices at which the dealer
usually sells such vehicles," *or* (ii)"increased [the price] because of the amount paid for the trade-
in vehicle."  The language is clear that either is sufficient to make the exception unavailable.
Moreover, as discussed above, Defendant acknowledges that it increased the price of the vehicle
because of the amount paid for the trade-in vehicle.

## II.     Standard of Review

A motion for summary judgment may be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  In assessing a motion for summary judgment, a court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the non-moving party. *Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013).

## III.    Discussion

The Court begins with TILA, it being the federal claim serving as the basis of this Court's jurisdiction.  TILA is a disclosure statute concerned with consumers' "informed use of credit," which "results from an awareness of the cost thereof by consumers."  15 U.S.C. § 1601(c).  TILA "reflect[ed] a transition in congressional policy from a philosophy of 'Let the buyer beware' to one of 'Let the seller disclose.'" *Mourning v. Family Pub. Serv., Inc.*, 411 U.S. 356, 377 (1973).  Its specific purpose is "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices."  *Id.*  "TILA is a remedial statute, it is interpreted strictly in favor of the consumer." *Frazee v. Seaview Toyota Pontiac, Inc.*, 695 F. Supp. 1406, 1408 (D. Conn. 1988).

Plaintiff alleges Defendant violated TILA by proffering inaccurate disclosures in the Retail Installment Contract.  Specifically, she alleges "Barberino violated TILA by not accurately itemizing the amount financed . . . [in light of the fact that] the cash price of the Vehicle was inflated, in part, in order to compensate for the overallowance allowed on Plaintiff's Camry."  Doc. 31 ¶¶ 65-66.

Plaintiff also alleges that "the cash price of the Vehicle was inflated, in part, for purposes of recouping the discount fee charged by Regional, which amount should have been disclosed as part of the finance charge." Doc. 31 ¶ 68.

Two provisions of TILA are at issue. Section 1638(a)(2)(B) requires in certain instances that a creditor provide a "written itemization of the amount financed" of a given loan. Section 1638(a)(3) requires that a creditor accurately disclose the "finance charge," as defined by TILA.[8]

Defendant argues it committed no TILA violation. It initially argued that it was not liable under TILA only because it properly disclosed the "finance charge" pursuant to Section 1638(a)(3). In so arguing, it relied on *Poulin v. Balise Auto Sales, Inc.*, 647 F.3d 36, 38 (2d Cir. 2011), which held that defendant-car dealership's increase of the sales price of a car far above its market value could not be construed as a backdoor (*i.e.*, undisclosed) increase to the "finance charge." Doc. 34-1, at 3-5. The *Poulin* court held as such because TILA exclusively governs *credit* arrangements, and thereby is not implicated where a sales price is increased in such a way, as here, that the increased price would be paid by cash and credit customers alike. 647 F.3d at 39 ("Charges imposed uniformly in cash and credit transactions are not finance charges."); *see also Frazee*, 695 F. Supp. at 1408 ("Any differential between the fair value of the car and its cash price is attributable to a bad bargain, or perhaps a violation of the bargain in the sale of the car, and not any hidden finance charges."). Here, the uncontroverted deposition testimony of John Mocadlo, Barberino's Managing Partner, is that Barberino charges an "identical" amount when selling a car for cash as opposed to credit. Doc.

---

[8] TILA defines "finance charge" as: "[T]he sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit. The finance charge does not include charges of a type payable in a comparable cash transaction." 15 U.S.C. § 1605(a)

34-3, at 19.  Plaintiff neither argues nor offers any evidence to the contrary.  Specifically, she

nowhere demonstrates—or avers—that Barberino added the trade-in over-allowance to the price of

its cars only to its customers paying by credit rather than by cash.  In such a situation, the finance

charge requirement of TILA, "a disclosure statute, not a fair pricing law," *Poulin*, 647 F.3d at 38, is

not applicable.

Plaintiff seems to acknowledge that *Poulin* bars a Section 1638(a)(3) claim.  Rather, she now

argues that Barberino violated TILA only "by not accurately itemizing the amount financed as

required by 15 U.S.C. § 1638(a)(2)(B)."  Doc. 36, at 10.  In support, Plaintiff claims the following

alleged inaccuracies in the itemization of amount financed:

> Th[e] itemization shows the bogus $3,500 allowance being credited
> towards the purchase of the Altima.  It also lists the cash price of the
> Altima which, as acknowledged by Loureiro, included the $3,500
> allowance as part of the total price.  This was a false and inaccurate
> itemization, because Barberino manipulated the numbers to give the
> false impression that Plaintiff received $3,500 credit for her nearly
> worthless Camry.

Doc. 36, at 10-11.[9]

Despite her efforts, Plaintiff has not identified any factual inaccuracy on the itemization of

amount financed.  Plaintiff was offered a cash price for the Nissan Altima of $31,322.80.  She agreed

---

[9]  Theoretically, Plaintiff's argument may suffer from a fatal defect barring its claim under
§ 1638(a).  12 C.F.R. § 226.18(c)(2) states that a "creditor need not comply" with the statutory
requirements where it "provides a statement that the consumer has the right to receive a written
itemization of the amount financed, together with a space for the consumer to indicate whether it
is desired, and the consumer does not request it."  Here, the Retail Purchase Order states below
Plaintiff's signature: "YOU HAVE THE RIGHT TO RECEIVE AT THIS TIME AN
ITEMIZATION OF THE AMOUNT FINANCED."  Directly below are two boxes, one marked
"I WANT AN ITEMIZATION" and the other "I DO NOT WANT AN ITEMIZATION."
Plaintiff checked neither box.  Therefore, Barberino may not have been required to comply with
TILA's requirements as to the written itemization of the amount financed.  However, Defendant
has not asserted this argument, and the Court does not base its conclusion upon the theory.

to that price.  To pay for same, she agreed to pay a creditor a principal balance of $29,280.23,

documented as an "amount financed" on her credit agreement.  Although the purchase of the car was

without a doubt a bad bargain for Plaintiff—*i.e.*, a price $7,172.80 above the manufacturer's

suggested price—these were the figures disclosed to her on the itemization of amount financed and

they represent a true and accurate description of the terms of her credit arrangement.  In other words,

the contract stated that she would be financing $29,280.23 (in TILA's terms, her "amount financed"),

and she in fact did finance $29,280.23 and owed as much ultimately to Regional.  For the purposes

of TILA, it is of no moment that the disclosed price of the car included the $3,500 value of her trade-

in car despite Defendant's advertised trade-in program.  As stated on a nearly identical set of facts:

> The focus of the TILA is full **disclosure** of all terms and charges.
> The value of the trade-in, and (by Plaintiff's theory) resulting inflation
> of the sale price, were fully set forth in the [credit agreement].
> Regardless of whether Plaintiff was unfairly taken advantage of in the
> overall transaction, I do not see a violation of the TILA. . . .  All of
> the financial terms of the transaction were set forth in full.

*Gregory v. Metro Auto Sales, Inc.*, 2016 WL 336861, at *3 (E.D. Pa. Jan. 27, 2016) (emphasis in

original); *cf. Diaz v. Paragon Motors of Woodside, Inc.*, 424 F. Supp.2d 519, 530 (E.D.N.Y. 2006)

(finding that "an increase in price above the advertised price constitute[d] a hidden finance charge

*because [Plaintiff] was forced to pay the increase based on his need to secure sub-prime financing*"

(emphasis added)).  Although there may be a tension between Barbarino's shamelessly admitted

practice and the letter or spirit of consumer protection laws, it is simply not a TILA violation.  Nor

is the listing of the $3,500 trade-in allowance.  Plaintiff refers to this as "the bogus $3,500

allowance," but she was in fact allowed a $3,500 reduction in the cash price of the car.  Although

that price was inflated in light of Defendant's practice of in essence erasing the benefit it purported

to offer through its advertised trade-in program, it was, as dispositive here, a *disclosed* amount.  In

short, for much of the same reason that an inflated yet accurately disclosed cash price cannot

constitute an inaccurate "finance charge," such a cash price cannot constitute an inaccurate "amount

financed."  For purposes of TILA, it is of no moment that Barberino did not disclose certain facts

with respect to Plaintiff's agreement to *purchase* the car.[10]  What matters is whether Barberino failed

to disclose accurately anything related to Plaintiff's agreement to *finance* the car.  Plaintiff simply

has not shown this.

Tellingly, Plaintiff has not proffered a single court decision finding that an inflated, but

accurately disclosed, "amount financed" constituted a violation of TILA § 1638(a)(2)(B).  Plaintiff's

heavy reliance on the California state appellate case, *Thompson v. 10,000 RV Sales, Inc.*, 31 Cal.

Rptr.3d 18 (Cal. Ct. App. 4th 2005), is misplaced.  There, the appellate court held, *inter alia*, that a

car dealership violated California law by "increasing the cash price to include an over-allowance on

a trade-in vehicle in a credit transaction."  Despite some broad language in the opinion*, Thompson*

is not on point.[11]  There, like here, the plaintiff aimed to trade in a previously owned vehicle towards

the purchase of a new vehicle.  However, unlike Plaintiff here, that plaintiff had an outstanding loan

---

[10]  To hold otherwise would vastly broaden TILA's scope.  Plaintiff's theory would mean that any unfair practice by a merchant that in any way inflates the price of a good would constitute a TILA violation if the consumer purchases the good on credit.  However, TILA is not a broad *consumer* protection statute, it is a broad *borrower* protection statute.  As such, it is expressly focused on the cost of credit itself, not the cost of goods purchased on credit.  *See* 15 U.S.C. § 1601(a) ("The informed used of credit," the goal of TILA, "results from an awareness of *the cost thereof* by consumers" (emphasis added)).  Similarly, Plaintiff's theory would broaden TILA's focus from protecting consumers from "the various financial institutions and other firms engaged in the extension of consumer credit," towards protecting them from all merchants whose customers simply purchase on credit.  TILA is not so broad.

[11]  It is also manifest that the court in *Thompson* was expressly addressing and applying California law.  Specifically, the decision focused extensively on California's Automobile Sales Finance Act ("ASFA"), *id.* at 32 ("10,000 RV did not properly disclose the cash price as required by [ASFA] section 2982, sudvision (a)(1)(A)").  The decision makes no reference to TILA's Section 1638(a)(2)(B).

balance on her trade-in car, and, moreover, one that was larger than the value of the vehicle. Specifically, the trade-in was worth $30,000 but was subject to a $46,000 loan balance, amounting to $16,000 of negative equity. The defendant dealership then over-valued the car at $54,000 for purposes of the trade-in, which it did only "to obtain lender approval for the purchase." *Id.* at 21; *see also id.* at 22 (10,000 RV's sales manager "testified he valued Thompson's trade-in vehicle at $54,000 rather than $30,000 for purposes of obtaining credit approval for Thompson's purchase"). As the court found, "the $24,000 over-allowance was added to the $69,398 price of the Safari *a cash purchaser would pay*." *Id*. at 22; *see also id.* (10,000 RV's sales manager "admitted negative equity *is not included in the selling price for a cash buyer* because the only reason for this practice . . . is to obtain financing for a credit buyer") (all emphases added).

In short, the *Thompson* defendant purposefully hid from the lender plaintiff's negative equity in the trade-in to demonstrate a purported net positive trade-in value such that plaintiff would satisfy the lender's loan-to-value ratio requirements. Moreover, the defendant failed to disclose any of this to the plaintiff. The court held this to be against California's "official policy relating to negative equity [which] reflects that adding either disclosed or undisclosed negative equity to the cash price of the vehicle is illegal." *Id.* at 32. It is clear that the California court was concerned specifically with undisclosed trade-in over-allowances that aimed to distort a credit purchaser's equity position.

Where such negative equity is hidden from the lender, and in a way that is not disclosed to the borrower, such as in *Thompson*, there are legitimate reasons to be concerned about the borrower's awareness of the true terms of her credit arrangement, and laws akin to TILA are impacted. Here, in contrast, Morales owed nothing on her trade-in[12] and therefore there are no concerns in the case

---

[12] Plaintiff testified that she "finished paying for [the Camry] in 2011." Doc. 35-1, at 25.

at bar of hiding negative equity.  She knew (or had access to the documents to learn) exactly the

terms that governed each element of her credit transaction.  Barberino may have proffered a bad

bargain, but it did not do so by distorting a credit arrangement.

That TILA is not at issue in this circumstance is supported by official staff commentary as

to Regulation Z, which acknowledges that negative equity should be included in a disclosed "amount

financed" in order for a credit agreement to be properly disclosed to a borrower:

> Comment 18(c)-2 is revised in response to requests for guidance by creditors offering credit sales when downpayments involve a trade-in and an existing lien that exceeds the value of the trade-in.  ([*i.e.*], where a consumer owes $10,000 on an existing automobile loan and the trade-in value of the automobile is $8,000, leaving a $2,000 deficit.)
>
> *The amount by which the lien exceeds the trade-in value* would be reflected in the amount financed. . . .  Assuming the cash price for the new car was $20,000, the amount financed would be $22,000 ($20,000 representing the cash price plus $2,000 representing the excess of the lien over the trade-in value financed by the creditor.)
>
> The regulation provides great flexibility for disclosing the itemization of amount financed.  Comment 18(c)-2 iii . . . is revised to clarify that *any amounts financed by the creditor and representing the excess of the lien over the trade-in value ($2,000 in this example) must appear on the itemization of the amount financed*.

Truth in Lending, 63 Fed. Reg. 16,669, 16,673 (April 6, 1998) (emphases added).

The regulation thus provides that negative equity in a trade-in must be disclosed as part of

the amount financed, but says nothing about generally disclosing the inclusion of a trade-in

overallowance.  This makes eminent sense in light of TILA's goals.  A consumer trading in a vehicle

with negative equity owes a balance on the earlier loan even after trading in the vehicle—*i.e.*, in the

example in the commentary above, the borrower still owes $2,000 on his initial credit

agreement—and may think that such balance was transferred to and included in the "amount

financed" on the credit agreement for the newer vehicle.  Therefore, failure to disclose the negative

equity amount may lead the borrower to be misinformed as to the amount owed to his or her

creditor(s).  This is simply not an issue where there is no negative equity on the trade-in—as with

Plaintiff here, the "amount financed" on the loan for the newer vehicle will be precisely the total

amount that the borrower owes his or her creditor(s).  TILA is thereby not implicated.[13]

In light of the foregoing, Plaintiff's TILA claim must be dismissed.

\*       \*       \*

Having dismissed Plaintiff's TILA claim, Plaintiff's CUTPA claim is all that remains.  This

federal Court's power to adjudicate that state law claim arises only from its power of supplemental

jurisdiction.  Supplemental jurisdiction is contrasted with original jurisdiction, which refers to those

cases which the U.S. Constitution or Congress expressly permit the federal courts to adjudicate.  28

U.S.C. § 1331.  Here, TILA was that source of original jurisdiction.  Plaintiff's CUTPA claim was

properly within the supplemental jurisdiction rule, 28 U.S.C. § 1367(a), which states in relevant part:

> [T]he district courts shall have supplemental jurisdiction over all
> other claims that are so related to claims in the action within such
> original jurisdiction that they form part of the same case or
> controversy under Article III of the United States Constitution.. .

---

[13] In addition to *Thompson*, Plaintiff relies on a ruling of this Court granting a motion to amend the complaint in *O'Neill v. Country Motors II, Inc.*, No. 15-cv-1069.  There, this Court allowed a TILA claim to proceed in light of several distinct allegations, including one that the defendants failed to "accurately itemiz[e] the amount financed [by] add[ing] the amount over-allowed on Plaintiffs' trade-in vehicle to the purchase price of the [Motor] Vehicle."  2015 WL 8779594, at \*8 (D. Conn. Dec. 15, 2015).  However, the plaintiffs made other allegations absent here, including, for example, that the defendants "overstate[d] the Annual Percentage Rate" applicable to the relevant credit agreement.  *Id.*  This Court, in express reliance on the distinct "plausibility" standard of review applicable to the motion pending before it, allowed the TILA claim *writ large* to proceed in light of the multiple allegations.  That ruling—again, assessing the plausibility of a proposed amended complaint—was issued without the benefit of any briefing by either party, let alone an evidentiary record.  It is of limited relevance at present.

However, § 1367(c)(3) goes on to state as follows:

> The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . .  the district court has dismissed all claims over which it has original jurisdiction.

This is the situation at present.  This Court must decide whether to exercise its discretionary authority to allow Plaintiff to try her state law claim in this federal tribunal.  For the reasons that follow, the Court declines to do so.

The setting at bar—in which all federal claims have been dismissed at summary judgment, leaving only state law claims behind—is a familiar one.  The Second Circuit has addressed the issue repeatedly, and, though reviewing only for an "abuse of discretion," has not been reluctant to find such discretion abused when a district court has retained a purely state law case.  In fact, it has held that "federal courts, *absent exceptional circumstances*, should abstain from exercising pendent jurisdiction when federal claims in a case can be disposed of by summary judgment." *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 53 (2d Cir. 1986) (emphasis added).  It has held so in light of its determination that "[i]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 305 (2d Cir. 2003) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S.343, 350 n.7 (1988)).  In *Lundy v. Catholic Health Systems of Long Island Inc.*, 711 F.3d 106 (2d Cir. 2013), the Second Circuit, after acknowledging that "[o]nce all federal claims have been dismissed, the balance of factors will usually point toward a declination," undertook to catalog those discrete instances in which it has endorsed the retention of jurisdiction following dismissal of federal claims:

> The dismissal of[14] state law claims has been upheld after dismissal of the federal claims, particularly where the state law claim implicated federal interests such as preemption, or where the dismissal of the federal claims was late in the litigation, or where the state law claims involved only settled principles rather than novel issues. And we have upheld the exercise of supplemental jurisdiction in situations when . . . the state law claims are analytically identical to federal claims.

The balance of the relevant factors make it apparent that Plaintiff's CUTPA claim would be best adjudicated in Connecticut state court. No issue of preemption arises, and the state claim bears no comparison to a federal claim.[15] Although the parties have engaged in substantive discovery, the case is likely ninety days from being trial ready. *See* Doc. 14; *c.f. Norwalk v. Ironworkers Loc. 6 Pens. Fund*, 81 F.3d 1182, 1191-92 (2d Cir. 1996) (retention of state law claims okay where federal claim was dismissed nine days before scheduled start of trial); *Raucci v. Rotterdam*, 902 F.2d 1050, 1055 (2d Cir. 1990) (same where federal claims dismissed after close of discovery and trial ready date). Further, the instant ruling is the Court's only substantive input to this case.

Most pressing, however, are comity concerns. The application of a broad and remedial consumer protection statute such as CUTPA necessarily involves weighing sensitive state-level policy concerns. A federal court should not rule on such questions without necessity. As the Second Circuit has explained, '[w]here a pendent state claim turns on novel or unresolved questions of state law . . . principles of federalism and comity may dictate that these questions be left for

---

[14] It is clear from context that the Second Circuit used the term "*dismissal of* state law claims" in error. Properly interpreted, the language should read: "*the retention of jurisdiction over* state law claims."

[15] There exists no federal unfair trade practice or unfair competition statute that would permit Plaintiff to recover for Defendant's alleged conduct. Although Congress provided a broad consumer protection statute under the Lanham Act, 15 U.S.C. § 1051, *et seq.*, the claim applies only to certain intellectual property disputes and is inapplicable to the present facts. *See Colligan v. Activities Club of N.Y., Ltd.*, 442 F.2d 686, 692 (2d Cir. 1971); *Omega Engineering, Inc. v. Eastman Kodak Co.*, 30 F. Supp.2d 226, 255 (D. Conn. 1998).

decision by the state courts.  This is particularly true if the federal claim on which the state claim

hangs has been dismissed.'"  *Valencia*, 316 F.3d at 306 (quoting *Seabrook v. Jacobson*, 153 F.3d 70,

76 (2d. Cir. 1998)); *Lundy*, 711 F.3d at 118 (federal court should consider whether "the state law

claims involved only settled principles rather than novel issues"); *B&M Serv. Station v. Norwich*,

2000 WL 305981, at *10-11 (D. Conn. Feb. 25, 2000) (granting defendants' motion for summary

judgment as to federal claims and declining to exercise supplemental jurisdiction over state law

claims, including for CUTPA, because they "are uniquely matters of state law which the state courts

should adjudicate").  There appear to be scant rulings from Connecticut state courts making rulings

or entering judgements as to whether the specific conduct alleged by Plaintiff constitutes CUTPA

violations.  In fact, Plaintiff only supports one of its alleged specific CUTPA predicate acts with

Connecticut case law, citing two nearly identical decisions from the same Connecticut trial court

judge that allowed plaintiff to overcome a motion to strike by alleging that a dealership sold cars

above the Monroney sticker price without affixing a supplemental sticker.  Doc. 36, at 7 (citing

*Emmanuelli v. Merriam Motors, Inc.*, 35 Conn. L. Rptr. 407 (Conn. Super. Ct. 2003) and *Valencia*

*v. Crabtree Imports, Inc.*, 2004 WL 424499 (Conn. Super. Ct. Feb. 24, 2004)).  She cites no case law

to support her other specific contentions.  Defendant, for its part, cites to no case law addressing the

specifically alleged conduct supporting Plaintiff's CUTPA claim.  This federal court should not

unnecessarily decide novel questions of state law, and chooses not to do so in this case.  Plaintiff's

CUTPA claim is dismissed without prejudice to filing such a claim in state court.

## IV.    Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED.  In

consequence, Plaintiff's claim for violation of the Truth in Lending Act, 15 U.S.C. § 1601, *et seq.*

is DISMISSED WITH PREJUDICE; Plaintiff's claim for violation of the Connecticut Unfair Trade

Practices Act, Conn. Gen. Stat. § 42-110a, *et seq*. is DISMISSED WITHOUT PREJUDICE to re-

filing in an appropriate jurisdiction.  The Clerk is directed to close the file.

**It is SO ORDERED.**

**Dated: New Haven, Connecticut**
      **May 5, 2016**

                                                */s/ Charles S. Haight, Jr.*
                                                **Charles S. Haight, Jr.**
                                                **Senior United States District Judge**